```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
 2                       AUSTIN DIVISION

 3   RAVGEN, INC.,                      ) AU:20-CV-00692-LY
                                        )
 4      Plaintiff,                      )
                                        )
 5   v.                                 ) AUSTIN, TEXAS
                                        )
 6   NATERA, INC., NSTX, INC.,          )
                                        )
 7      Defendants.                     ) FEBRUARY 28, 2023

 8        *********************************************
                 TRANSCRIPT OF SCHEDULING CONFERENCE
 9              BEFORE THE HONORABLE LEE YEAKEL
          *********************************************
10

11   FOR THE PLAINTIFF:   DERON R. DACUS
                          THE DACUS FIRM, P.C.
11                        821 EAST SOUTHEAST LOOP 323, SUITE 430
12                        TYLER, TEXAS 75701

13                        KERRI-ANN LIMBEEK
                          DESMARAIS LLP
14                        230 PARK AVENUE, 26TH FLOOR
                          NEW YORK, NEW YORK 10169
15
     FOR THE DEFENDANTS:  STEPHEN M. HASH, ALEXANDER T. PIALA
16                        MCDERMOTT WILL & EMERY LLP
                          303 COLORADO STREET, SUITE 2200
17                        AUSTIN, TEXAS 78701

18                        MICHAEL J. SUMMERSGILL
                          WILMER CUTLER PICKERING HALE AND DORR LLP
19                        60 STATE STREET
                          BOSTON, MASSACHUSETTS 02109
20
                          AMANDA L. MAJOR
21                        WILMER CUTLER PICKERING HALE AND DORR LLP
                          2100 PENNSYLVANIA AVE, NW
22                        WASHINGTON, D.C. 20037

23   COURT REPORTER:      ARLINDA RODRIGUEZ, CSR
                          501 WEST 5TH STREET, SUITE 4152
24                        AUSTIN, TEXAS 78701

25   Proceedings recorded by computerized stenography, transcript
     produced by computer.
```

| | | |
|---|---|---|
| 14:01:23 | 1 | (Open court) |
| 14:01:23 | 2 | THE COURT:  We're here today for a scheduling |
| 14:01:25 | 3 | conference, or conference of some kind, in Cause Number |
| 14:01:26 | 4 | 20-CV-692, *Ravgen, Incorporated v. Natera, Incorporated* and |
| 14:01:32 | 5 | others. |
| 14:01:32 | 6 | Let me start with the plaintiff, and tell me who is |
| 14:01:35 | 7 | here, please. |
| 14:01:36 | 8 | MR. DACUS:  Good afternoon, Your Honor.  Deron Dacus |
| 14:01:39 | 9 | on behalf of the plaintiff, Ravgen.  And here with me is |
| 14:01:43 | 10 | Kerri-Ann Limbeek with the Desmarais law firm, and we're ready |
| 14:01:47 | 11 | to proceed, Your Honor. |
| 14:01:47 | 12 | THE COURT:  All right.  Give my just a minute. |
| 14:01:54 | 13 | There's so many people listed in the caption, I need to find |
| 14:01:57 | 14 | you-all. |
| 14:02:00 | 15 | And for the defendants? |
| 14:02:01 | 16 | MR. HASH:  Your Honor, Stephen Hash from McDermott |
| 14:02:04 | 17 | Will & Emery, with Alex Piala, on behalf of Natera.  We also |
| 14:02:09 | 18 | have cocounsel Michael Summersgill and Amanda Major from Wilmer |
| 14:02:14 | 19 | Hale.  And we're ready to proceed. |
| 14:02:18 | 20 | THE COURT:  All right.  Give me those names again. |
| 14:02:22 | 21 | You're Mr. Hash, and I got Ms. Major.  Who else is here? |
| 14:02:24 | 22 | MR. HASH:  Piala, P-i-a-l-a, from McDermott. |
| 14:02:27 | 23 | THE COURT:  All right. |
| 14:02:27 | 24 | MR. HASH:  And Summersgill, Michael Summersgill. |
| 14:02:28 | 25 | THE COURT:  All right.  Thank you.  All right.  I've |

14:02:33  1  gotten a bunch of things in from you-all on this.  And, quite
14:02:37  2  candidly, I know this case has bounced around a little bit, but
14:02:39  3  the way you-all are proceeding in it is not the way this court
14:02:43  4  generally proceeds with things.
14:02:44  5       I've got 17 pending motions that I just find
14:02:50  6  ridiculous.  We don't have time to deal with 17 motions in a
14:02:53  7  patent case.  You're asking me to give you a trial date, yet
14:02:56  8  some of those motions want amendments to the Markman order.  I
14:03:02  9  amended the Markman order once when you-all asked me to do it.
14:03:07 10  I thought that was going to be it.  We don't have an ongoing
14:03:10 11  process around here where we keep revisiting Markman, no matter
14:03:15 12  what you-all may think.
14:03:16 13       Also, I've got motions in limine.  And let me just
14:03:23 14  tell you, somewhere over the years that I have been practicing
14:03:26 15  law, motion in limine practice has morphed into something it
14:03:32 16  was never intended to be.  The sole purpose of a motion in
14:03:35 17  limine is to exclude testimony and questions that are so highly
14:03:40 18  inflammatory or prejudicial they can't be cured by an objection
14:03:43 19  or an instruction to disregard.  Going through your motions, I
14:03:50 20  see precious few, if any, of those topics.
14:03:53 21       Motions in limine are not trial management orders.
14:03:57 22  When I grant motions in limine, they become very disruptive to
14:04:04 23  the course of the trial, because they're not motions to
14:04:07 24  suppress evidence.  It just means you can't offer something
14:04:11 25  unless you get up and approach the bench and ask if you can

14:04:14  1   offer it.

14:04:17  2         I know you-all are very experienced and tried a lot

14:04:20  3   of cases, and you're bound to know how disruptive that is to

14:04:23  4   the jury.  It causes the jury to lose their trains of thought

14:04:26  5   when something is going on up here on the bench or I have to

14:04:30  6   excuse them and send them back to the jury room so we're more

14:04:33  7   comfortable in discussing it.

14:04:35  8         I have yet to see the case that has more than two or,

14:04:38  9   at the outside, three of those highly inflammatory or

14:04:42  10  prejudicial matters that can't be cured by an objection or an

14:04:46  11  instruction to disregard.

14:04:53  12        I've got seven Daubert motions.  I've got motions to

14:04:56  13  strike portions of the expert reports.  I've got motions to

14:04:58  14  supplement export reports.

14:05:01  15        My question to you is:  Have you-all sat down with

14:05:04  16  one another and tried to resolve any of these pending motions?

14:05:09  17        I'll start with the plaintiff.  Mr. Dacus?

14:05:12  18        MR. DACUS:  With the Court's permission, Your Honor,

14:05:14  19  I'll have Ms. Limbeek address that, if that's okay.

14:05:18  20        THE COURT:  That's fine.  I just recognize you

14:05:19  21  because you got up first earlier.

14:05:21  22        MR. DACUS:  Understood, Your Honor.  Thank you.

14:05:23  23        THE COURT:  Ms. Limbeek, have you-all -- and I'm

14:05:26  24  going to hear from the defendant, too.  But have you done

14:05:28  25  anything at all between the two sides to try to sit down and

14:05:31  1   work out what we need to do to get this case to trial?

14:05:34  2         MS. LIMBEEK:  So, Your Honor, we had a meet and

14:05:39  3   confer last week.  Because the case has been stayed, we haven't

14:05:41  4   been sort of proceeding with trying to figure out the narrowing

14:05:47  5   of the motions.  But we proposed to the other side last week

14:05:52  6   that we think we can compromise on a number of the motions in

14:05:56  7   limine.

14:05:56  8         And if we can meet and confer with the other side on

14:05:58  9   those, I think that, from the plaintiff's perspective, we can

14:06:03  10  narrow to just a couple of motions that we want to proceed with

14:06:05  11  in front of Your Honor.  And we're happy to update you on that,

14:06:09  12  but we have not yet had that meet and confer to try to

14:06:13  13  compromise on those motions.

14:06:14  14        THE COURT:  Let me hear from the defendant.

14:06:19  15        MR. HASH:  Well, Your Honor, we do believe that there

14:06:22  16  are areas for compromise here.  It's our understanding, though,

14:06:24  17  from the plaintiffs that they're looking to reopen expert

14:06:28  18  discovery, reopen fact discovery, file new motions.  And so

14:06:33  19  before we get on the road with meeting and conferring, we

14:06:36  20  weren't sure about the status of the stay.  But also it looks

14:06:40  21  like there's a whole new ball of wax of additional filings that

14:06:46  22  at least the plaintiffs are contemplating.

14:06:48  23        And to the extent that they're going to file

14:06:49  24  additional motions, file for supplementing expert discovery,

14:06:55  25  file for supplementing fact discovery, I think we would need to

14:06:57   1   be in the same boat of similarly supplementing the record.

14:07:01   2            THE COURT:  Okay.  Fine.  You know, you are in

14:07:07   3   possibly -- well, you certainly are in Texas -- the worst

14:07:09   4   possible Division to have this case.  And I know you wanted it

14:07:12   5   to go back to Waco, and you've read what I've had to say about

14:07:17   6   that.

14:07:17   7            But I've been on this bench a fairly long time now.

14:07:22   8   Most patent cases settle, so I haven't tried a lot of patent

14:07:25   9   cases to verdict.  But I have managed an awful lot of patent

14:07:30  10   cases from beginning to end, and I'm not used to seeing them

14:07:34  11   like this.  I'm looking -- I'm used to seeing them a whole lot

14:07:39  12   better organized by this stage in the proceeding.

14:07:43  13            So I've got another question, and that is:  How has

14:07:48  14   this case changed because of the action by the Patent Trial and

14:07:56  15   Appeal Board that you described for me in your joint status

14:07:59  16   report that was filed February 3rd?

14:08:02  17            Again, I'll go to the plaintiff.  Ms. Limbeek.

14:08:05  18            MS. LIMBEEK:  Thank you, Your Honor.

14:08:06  19            So at this point the patent office has now -- we've

14:08:13  20   now concluded nine out of ten IPRs that were filed by various

14:08:19  21   parties.  And at the conclusion of those nine IPRs, not a

14:08:25  22   single claim in either of the patents has been invalidated.

14:08:30  23   And so there are two patents-in-suit in this case, there are

14:08:33  24   seven asserted claims, currently, and there's only one IPR

14:08:38  25   left.  There's only two challenged claims in that IPR, and the

14:08:44  1  patent office has already issued final written decisions in two

14:08:49  2  other IPRs on the same claims, on the same arguments, and found

14:08:53  3  that those claims were valid.  And so we are expecting this

14:08:57  4  last tenth IPR to go the same way as the last nine and conclude

14:09:02  5  with all of the claims being valid.

14:09:04  6        And so I think there's a minimal, minuscule

14:09:10  7  probability that the patent office is all of a sudden going to

14:09:14  8  change course after nine IPRs concluding and the claims

14:09:18  9  remaining valid.

14:09:20  10       And I'll just note, Your Honor, that another court,

14:09:24  11  the Delaware court where there are four cases pending regarding

14:09:28  12  these -- these two asserted patents, recently lifted a stay in

14:09:35  13  those four cases based on the IPRs -- nine IPRs concluding and

14:09:41  14  not a single claim being invalidated.  And, in fact, in

14:09:44  15  Delaware the defendants all agreed that the stay should be

14:09:49  16  lifted, because at this point we've heard from the patent

14:09:52  17  office repeatedly on every single asserted claim, and they're

14:09:56  18  not going to invalidate these claims and simplify the case.

14:10:00  19       And so that's the latest.  The stay was lifted in the

14:10:04  20  Delaware cases on February 13th.

14:10:08  21       THE COURT:  Defendants agree or disagree or want to

14:10:12  22  add anything to that?

14:10:13  23       MR. SUMMERSGILL:  Your Honor, Michael Summersgill on

14:10:16  24  behalf of Natera.

14:10:18  25       We disagree with some of the characterizations; we

14:10:21  1  agree with some of the facts.  Just to step back, there is

14:10:26  2  still one IPR pending.  That's Streck's IPR.  The decisions in

14:10:30  3  that are due in April.

14:10:33  4            THE COURT:  And what is involved in that?

14:10:35  5            MR. SUMMERSGILL:  Well, between that -- between that

14:10:36  6  and then Natera re-exams that are stayed at Ravgen's request,

14:10:42  7  all of the claims at issue here are being challenged.  And

14:10:46  8  Ravgen, you know, may have a view that they're not going to be

14:10:51  9  invalidated, but the PTAB could have a very different view.

14:10:55  10           So -- so there are still those -- that IPR and those

14:10:59  11  re-exams pending.  And Mr. Hash, at Your Honor's -- if it would

14:11:04  12  be helpful to Your Honor, was going to address our view that

14:11:08  13  the stay should remain in place.

14:11:09  14           But to address your -- the question of what's

14:11:12  15  happened since the fact of -- since the close of fact discovery

14:11:17  16  and the stay in this case, a whole lot has happened.

14:11:21  17           Ms. Limbeek is correct that, you know, there have

14:11:25  18  been many decisions from the PTAB.  As part of that, the PTAB

14:11:31  19  has found that certain claim limitations at issue in this case

14:11:34  20  have certain requirements.  Ravgen relied on those

14:11:39  21  requirements.  We think that affects those issues -- the issues

14:11:42  22  in this case.  Ravgen witnesses have testified in other cases

14:11:47  23  in ways that impact the issues in this case.  A judge,

14:11:52  24  Judge Klausner, in the Central District of California,

14:11:55  25  construed a Ravgen contract in a way that could severely limit,

14:11:59  1   if not eliminate, all of the damages in the case and a number

14:12:04  2   of -- of other things.

14:12:06  3          THE COURT:  And what's the status of that case now?

14:12:08  4          MR. SUMMERSGILL:  That case was settled shortly after

14:12:10  5   that ruling from Judge Klausner.

14:12:13  6          So the plaintiffs approached us -- Ravgen approached

14:12:17  7   us and suggested that discovery should be reopened so they

14:12:23  8   could supplement their case.  Our position was the stay should

14:12:27  9   remain in place because the rationale for the stay in the first

14:12:30 10   place is still out there.  There is still post-grant

14:12:33 11   proceedings pending.

14:12:34 12          But, if the stay were to be lifted, if that's

14:12:39 13   Your Honor's inclination, then the discovery should be opened

14:12:42 14   for both sides so that all of the events that have occurred can

14:12:48 15   be taken into account, because what has happened impacts the

14:12:54 16   noninfringement defenses, it impacts the invalidity defenses,

14:12:59 17   very significantly affects the damages defenses, and there's

14:13:03 18   this contract issue, Your Honor, based on Judge Klausner's

14:13:06 19   ruling that could be dispositive of the damages case and the

14:13:09 20   entire case.

14:13:10 21          So we think, if the case is going to go forward, if

14:13:13 22   the stay is going to be lifted, that the record -- discovery

14:13:17 23   should be open for both sides, we should have fact discovery,

14:13:22 24   expert discovery.  And then I think after that, that will have

14:13:26 25   a -- a natural process of narrowing the number of motions at

14:13:30  1   issue.

14:13:32  2          I think -- you know, of the 21 total motions, I

14:13:34  3   think, 8 are Natera, 13 are Ravgen.  And I would say that after

14:13:42  4   that initial discovery period, we would very significantly

14:13:45  5   narrow the number of motions of down to a handful.

14:13:52  6          THE COURT:  It's a tennis match.  Ms. Limbeek?

14:13:56  7          MS. LIMBEEK:  So, Your Honor, I think while there are

14:13:59  8   few things that have occurred since the close of discovery in

14:14:03  9   this case that would require very minor and narrow supplements

14:14:07  10  to expert reports, for example, this is not a case that needs

14:14:12  11  to be -- where discovery needs to be opened, fact discovery,

14:14:16  12  expert discovery, and we need to refile everything.

14:14:19  13         And I just want to address briefly opposing counsel

14:14:23  14  comments about a potential contract issue that came up in

14:14:29  15  another case.  First of all, that order has been vacated in the

14:14:33  16  other case.  And, second of all --

14:14:35  17         THE COURT:  Well, was it vacated because the case was

14:14:37  18  settled?

14:14:38  19         MS. LIMBEEK:  Yes.

14:14:39  20         THE COURT:  Okay.

14:14:39  21         MS. LIMBEEK:  And the -- but regardless of that,

14:14:42  22  Natera in this case never ever raised that license as a

14:14:48  23  defense, and that license was produced in fact discovery, and

14:14:53  24  it was analyzed by both parties' experts.  And Natera did not

14:14:58  25  amend its pleading to add that defense.  It did not raise that

14:15:02  1   defense in its contentions.  It did not raise that defense

14:15:05  2   during its interrogatory responses.  And this is the first

14:15:09  3   we're hearing of it from Natera based on a vacated order.

14:15:12  4          And so I don't think that Natera should be allowed to

14:15:17  5   reopen discovery and motion practice on issues where Natera had

14:15:22  6   the document in front of it and chose different defenses than

14:15:26  7   the other defendants in different cases.

14:15:29  8          So we don't want to get into a situation where we're

14:15:32  9   relitigating things that have already -- that -- you know, the

14:15:37  10  parties have gone through this case and they've narrowed the

14:15:40  11  asserted claims and they've narrowed the defenses and they've

14:15:43  12  narrowed the prior art in preparation for trial.  To now allow

14:15:48  13  Natera to reopen discovery to argue different defenses, when

14:15:53  14  nothing has changed on the facts and they had the license and

14:15:56  15  they had all of the documents during discovery, I think would

14:15:59  16  be very prejudicial and inefficient.

14:16:04  17         And so that -- in addition, after that order

14:16:08  18  vacating -- after that order was vacated, there's been an

14:16:13  19  amendment to the license indicating the parties' intent not --

14:16:16  20  for that license not to apply to the defendants in this case

14:16:21  21  and others.  That makes -- you know, any motion on that is

14:16:26  22  going to -- or any amendment to the answer to add that defense

14:16:30  23  is going to be futile anyway.

14:16:33  24         THE COURT:  Well, let me just say, if I were to

14:16:35  25  reopen discovery, that does not mean it reopens discovery and

14:16:40   1   the defendants get to allege different things.  Discovery is

14:16:45   2   separate from pleadings.  That does not mean I've reopened

14:16:49   3   pleadings or allowed an amended pleading just if I reopen

14:16:54   4   discovery.  So just know that these things are maybe all

14:16:58   5   connected like the boxcars on a railroad train, but it doesn't

14:17:02   6   mean they all arrive at the station at the same time.

14:17:05   7            MS. LIMBEEK:  Right.  Thank you, Your Honor.  I think

14:17:07   8   that's our position, too.  Is that while we may need to reopen

14:17:10   9   discovery for a few very narrow categories of documents that

14:17:14   10  were not available in this case before discovery closed and the

14:17:18   11  case was stayed, we shouldn't be reopening discovery on

14:17:23   12  anything that was available before discovery closed and

14:17:27   13  dispositive motions happened in this case.

14:17:34   14            THE COURT:  Go there first.  Then you get a chance.

14:17:36   15            MR. SUMMERSGILL:  Yes, sir.  Thank you, Your Honor.

14:17:37   16            Just to respond to that, two things.  To address the

14:17:42   17  broader issue, the plaintiffs -- Ravgen are the ones who

14:17:47   18  approached us that said discovery needed to be reopened,

14:17:51   19  reopening both fact and expert discovery.  Now, they've

14:17:55   20  characterized it as, you know, very narrow discovery.  But

14:17:58   21  really what it is, is in the IPRs they made an argument that

14:18:04   22  the claims require a specific type of agent that actually

14:18:08   23  inhibits lysis.

14:18:09   24            In this case they don't have hard evidence right now

14:18:17   25  that what is in the blood collection tubes that Natera uses

14:18:21 1  actually inhibits lysis.  So that's what they're trying to add

14:18:25 2  into this case.  So that's a pretty fundamental change.  And,

14:18:28 3  you know, if -- if they're allowed to make that change, then

14:18:31 4  we -- we say we should be able to reopen the record as well.

14:18:35 5         THE COURT:  Well, just know this:  If I were to

14:18:37 6  reopen the record, it's going to apply to both of you.  It

14:18:41 7  would never be my intention to allow one side to do what they

14:18:44 8  want to do and the other side not to be allowed to answer it.

14:18:48 9  So we don't need to debate that.  The question is whether we

14:18:51 10 ought to reopen the record or not.  But, if we reopen the

14:18:55 11 record, then everybody's going to get to play.

14:18:59 12        MR. SUMMERSGILL:  Thank you, Your Honor.  And, in our

14:19:00 13 view, I mean, they're the ones that proposed reopening the

14:19:04 14 record.  And we agree it should be reopened, because a lot of

14:19:06 15 things have happened since the stay that should be accounted

14:19:09 16 for.

14:19:09 17        You know, for instance, Judge Albright issued a claim

14:19:13 18 construction after expert discovery, after all discovery, had

14:19:19 19 closed.  And, you know, for instance, the Federal Circuit has

14:19:26 20 held, you know, when claim construction changes after

14:19:28 21 discovery, the defendant ought to be given an opportunity to

14:19:30 22 adjust his defenses to account for that claim construction.

14:19:36 23        So given all of the things that happened, we agree

14:19:37 24 with Ravgen that the record should be reopened, and it should

14:19:41 25 be reopened for both sides.

14:19:44   1          I can walk through sort of the four categories where

14:19:47   2   we think it needs to -- the record needs to be supplemented

14:19:51   3   from Natera's perspective, if it would be helpful.  But let me

14:19:55   4   first address her point on the contract issue.

14:19:58   5          So two things.  Judge Klausner issued his ruling

14:20:06   6   construing that contract after discovery closed in this case

14:20:09   7   and after the stay was issued.  And so that's not something

14:20:14   8   that could have been accounted for in this case.

14:20:16   9          Ravgen then has tried to avoid that result in two

14:20:22  10   ways: one, by settling the case and requesting that, as part of

14:20:27  11   the settlement, the judgment be vacated.  And it was vacated as

14:20:30  12   part of the settlement, per your question.

14:20:33  13          The second piece is they've gone back and they have

14:20:36  14   tried to -- they've amended the contract with the other party

14:20:45  15   of the contract, Thermo Fisher, to try and eradicate the rights

14:20:50  16   that go to Thermo Fisher's customers, which would apply to

14:20:51  17   Natera.  But the issue is they're irrevocable rights.  You

14:20:54  18   can't eradicate the irrevocable rights through an amendment,

14:20:58  19   and even amendments make that clear.

14:20:59  20          So the fact of the amendments actually further

14:21:02  21   confirm that the license should apply to Natera.

14:21:08  22          THE COURT:  Now, stop right there.  If it's an

14:21:10  23   irrevocable right and you amend the contract, but both sides

14:21:14  24   agree to amend the contract, haven't both sides agreed to amend

14:21:17  25   the contract?  You're certainly not saying a right is so

14:21:20   1   irrevocable that the parties couldn't agree to do something

14:21:25   2   different with it?

14:21:27   3          MR. SUMMERSGILL:  Well, because it's rights that were

14:21:28   4   granted to third parties, so third-party beneficiaries, such as

14:21:32   5   Natera and such as Quest, for instance, which was the party out

14:21:38   6   in the Central District of California.  And as part of the

14:21:41   7   amendments, Thermo Fisher specifies -- Thermo Fisher is the

14:21:46   8   other party -- specified that any rights -- any vested rights,

14:21:52   9   which would be the rights granted to Natera, for instance,

14:21:54   10  would not be eliminated.

14:21:55   11         Now, you know, Ms. Limbeek said, well, we didn't make

14:22:00   12  that argument -- Natera didn't make that argument before.  But

14:22:03   13  there are new fundamentally different facts both in Judge

14:22:07   14  Klausner's construction of the agreement and then their

14:22:09   15  attempted amendments to the agreement.

14:22:13   16         And we recognize, Your Honor, we would have to seek

14:22:15   17  permission to add that issue to the case, and we would plan on

14:22:24   18  doing that.  We would at least request an opportunity to submit

14:22:28   19  brief briefing on why it should be added.  But it's a

14:22:28   20  fundamental change to the case.

14:22:28   21         And here is sort of the gist for us, the bottom line,

14:22:29   22  on they're issue:  Ravgen is trying to collect hundreds of

14:22:32   23  millions of dollars for products where they've been released

14:22:38   24  under that contract.  If Judge Klausner's ruling were applied

14:22:44   25  in this case, all of the $216 million that they currently seek

14:22:47  1   in their expert report would be eliminated.  And then there's a

14:22:53  2   chance that any further damages would be eliminated.  So

14:22:57  3   they're trying to collect on sales that have been released, and

14:22:59  4   we think that's significant enough that it ought to come into

14:23:02  5   this case.

14:23:03  6        The other aspect of damages is they've entered

14:23:06  7   additional licenses.  For instance, they entered a license with

14:23:11  8   Quest.  They have entered these amendments with Thermo Fisher.

14:23:15  9   Those all affect the damages case, and we think we need to

14:23:19  10  supplement there.

14:23:20  11       And then, if they're going to change their

14:23:23  12  infringement allegations, we ought to be able to respond in

14:23:26  13  kind by adjusting our response of noninfringement defenses and

14:23:30  14  our response of invalidity defenses.

14:23:36  15       Final thing I'll point out, Your Honor, in that in

14:23:39  16  some of the various litigations, there have been -- there has

14:23:42  17  been discovery and testimony on the issue of inequitable

14:23:45  18  conduct.  And this is an issue that is already in this case,

14:23:50  19  but additional information has come to light.

14:23:52  20       And the bottom line is that, when Ravgen and

14:23:58  21  Dr. Dhallan, the inventor, and his prosecuting attorney,

14:24:02  22  Cronin, went to the patent office, they said -- the claims were

14:24:05  23  initially rejected as obvious, and the examiner said you can

14:24:11  24  only get these claims if you show unexpected results.  Well,

14:24:14  25  they said, look, we do have unexpected results, these test

14:24:17   1  results, that show the high performance of our system.

14:24:23   2        So they went and they made that argument to the

14:24:25   3  patent examiner, and the patent examiner granted the patents

14:24:28   4  based on that argument and noted that that was the most

14:24:33   5  persuasive evidence submitted during prosecution.

14:24:35   6        Well, at the very same time they were making that

14:24:39   7  argument, they were aware that the leading scientists out in

14:24:42   8  the industry had analyzed those same experimental results and

14:24:47   9  concluded that they were inaccurate and unreliable.  And they

14:24:55  10  didn't disclose that to the patent office.

14:24:56  11        And both Dr. Dhallan and the prosecuting attorney

14:24:59  12  Cronin and another prosecuting attorney have been -- have given

14:25:01  13  testimony on those issues, and additional information has come

14:25:06  14  out that has highlighted both that the -- that the undisclosed

14:25:12  15  studies were highly material, in fact, so material that

14:25:16  16  Judge Klausner in California said the examiner would have

14:25:19  17  benefited from knowing that like-minded people in the art

14:25:24  18  thought these studies were relevant.  And the evidence was so

14:25:29  19  strong, Your Honor, that he scheduled a bench trial inequitable

14:25:35  20  contract ahead of any jury trial.  So that's the other area

14:25:38  21  where we think the record needs to be supplemented.

14:25:41  22        And so what we're looking for, Your Honor, is just

14:25:43  23  that, you know, both sides get to supplement and that the case

14:25:48  24  is ultimately tried on a complete record that accounts for

14:25:51  25  everything that's happened since the stay.  And I think,

14:25:55   1   Your Honor, that was one of the rationales for stay in the

14:25:58   2   first place, so that we could account for everything that

14:26:01   3   happened during the course of the stay.

14:26:03   4            THE COURT:  Well, there are two rationales, maybe

14:26:06   5   even three, for my stay.  One was as you described.  Two, I was

14:26:12   6   looking to see what was going to go on with what was pending in

14:26:19   7   Washington.  And, three, I didn't want you to file any more

14:26:21   8   motions until I had an opportunity to look at this case,

14:26:24   9   because you filed way too many motions.

14:26:27   10           You've got to understand lawyers only have one role

14:26:29   11  in a case, and that's to resolve the case.  You can do it in

14:26:32   12  one of three ways:  You could settle it or I could grant a

14:26:36   13  well-taken dispositive motion or, three, I could try the case.

14:26:38   14  And I really don't care which of the three it is.

14:26:42   15           But a well-taken dispositive motion is not after

14:26:47   16  we've had 18 million other motions.  You can get to the crux of

14:26:52   17  the case and present to the court your respective positions in

14:26:56   18  a whole lot easier manner and on a whole lot shorter road than

14:27:00   19  what I've seen in this case.

14:27:07   20           MR. SUMMERSGILL:  Your Honor, we agree, and I do

14:27:09   21  think that the additional discovery will have the help of sort

14:27:11   22  of focusing the parties.  And then what I'll say to you,

14:27:14   23  Your Honor, by my count, there are 21 total motions pending

14:27:18   24  before you.

14:27:18   25           THE COURT:  Well, that's scary, because we only

14:27:20  1  got 17.  We missed four somewhere.

14:27:24  2        MR. SUMMERSGILL:  Maybe my math isn't good, but I

14:27:26  3  think it's 21.  But 13 from Ravgen, eight from Natera.  And I

14:27:30  4  will commit to the Court that we will reduce -- you know, after

14:27:33  5  this discovery period, we focus -- our way of approaching

14:27:40  6  things is try and focus in on the issues that really matter.

14:27:42  7  And that's what we did before.

14:27:43  8        THE COURT:  All right.  I'm going to shift gears on

14:27:46  9  you a minute.  I don't need this responded to, but you get to

14:27:51 10  speak next anyway, whichever one of you wants to speak.

14:27:53 11        What I want you to do, I want each of you to tell me

14:27:57 12  in very few words what you think the court ought to do that

14:28:05 13  gets this case moving in a point with you-all working on it and

14:28:11 14  getting things to me that gets it to a resolution or a trial

14:28:16 15  setting without my -- if I have to deal with all these motions,

14:28:24 16  you're not going to get a trial setting for a long time,

14:28:26 17  because I have a tremendously large docket here.  You'll get

14:28:30 18  the sad song I give everybody.

14:28:32 19        The last time the Austin Division of the Western

14:28:34 20  District of Texas got a new judge position was 1991.  Unless

14:28:45 21  you've been living in a cave, you've noticed changes have come

14:28:47 22  to Austin in those 32 years.  If you buy into the concept, and

14:28:51 23  you should, that the amount of legal activity in an area is

14:28:57 24  generally a direct relation to the number of people in an

14:29:00 25  area -- the more people you put down in an area, the more

14:29:03  1  people sue one another and more crimes get committed, and

14:29:06  2  that's certainly been true here -- our docket has more than

14:29:15  3  doubled since 1991 and we have the same number of judges

14:29:18  4  handling it.  We have one more magistrate judge, but magistrate

14:29:19  5  judges can only go so far with you.  But that's it.

14:29:27  6       All of the judges you heard that got appointed in

14:29:29  7  four years of the Trump administration and all of the judges

14:29:33  8  you've heard that have now been appointed in two years of the

14:29:35  9  Biden administrations have all been filling vacancies.  And I'm

14:29:39  10  not going to tell you we didn't need the vacancies filled, but

14:29:44  11  that's not our problem in Austin.  We don't have a vacancy

14:29:47  12  problem; we've got a pure lack-of-judge problem.  And we don't

14:29:50  13  have an easy pool, like a lot of areas around the country have,

14:29:54  14  of senior judges.  And it's hard to get additional judges to

14:29:58  15  come in here and work with this docket.

14:29:59  16       We also have an extremely complex docket in Austin

14:30:05  17  because we get almost every case that comes out of each

14:30:10  18  legislative session on constitutionality of legislative

14:30:14  19  statutes.  You can file them all the around the state, but most

14:30:17  20  of them come here because it's where the legislature sits, and

14:30:21  21  the legislature is sitting right now.  And in the minds of many

14:30:24  22  people in Texas, the legislature increasingly shows itself

14:30:27  23  incapable of drafting constitutional legislation, so it all

14:30:31  24  comes in.  Those are hard cases; they always demand immediacy

14:30:35  25  on the docket.

14:30:36   1          As Austin has grown and has attracted more money to
14:30:41   2   Austin, including the high-tech companies that are here in
14:30:43   3   Austin, regular cases have gotten more complicated.  We have
14:30:48   4   more securities cases.  We have more complex contract cases.
14:30:52   5   And our criminal docket is rising, too.
14:30:57   6          So the only way I can get you in any kind of decent
14:30:59   7   schedule is if you-all decide you want to get this case
14:31:03   8   resolved and sit down and work with me on it.
14:31:07   9          I've got a big docket.  But if you envision it as a
14:31:10  10   block of cheese sitting in your way, it's Swiss cheese, it's
14:31:14  11   not cheddar cheese there are little holes.  One of the things
14:31:18  12   you have when you have an extremely big docket is there is
14:31:21  13   constantly cases moving off of it.  Cases get settled, things
14:31:25  14   get transferred, things get moved.  And so that opens up areas
14:31:32  15   to where I can do things that I couldn't actually schedule you
14:31:36  16   for that particular day on way out.
14:31:38  17          But your case -- anybody's case, to be able to fit
14:31:45  18   into one of those places where I can get you some relief and
14:31:49  19   get moving with you has to be in pretty good shape and ready to
14:31:55  20   go, and this one is just not quite there yet.
14:31:59  21          So the only reason I keep starting with the plaintiff
14:32:02  22   is because they started the fight and I'm old-fashioned.  I
14:32:05  23   read from top to bottom, and the plaintiff is usually above the
14:32:09  24   "v," so I hear from the plaintiff first.  But that's purely a
14:32:12  25   default.  It's not because I have a built-in prejudice for the

14:32:17   1   plaintiff.

14:32:17   2           So I want to hear from the plaintiff, and in very few

14:32:20   3   words tell me what you think you-all can do and what can be

14:32:30   4   done to where we can look at a decent schedule to get some

14:32:32   5   resolution to now 21 motions.  Because if I've got to try to

14:32:37   6   work on all those, then I drop everything else and you-all get

14:32:40   7   pushed even farther down the road.  Plus I haven't gone into

14:32:46   8   any detail on your Daubert motions and things like that.

14:32:48   9           But let me tell you, if somebody's complaining about

14:32:54  10   bona fides, and the expert has testified in 23 other federal

14:32:59  11   courts, the chances that I'm going to be the outlier and tell

14:33:02  12   you I'm not going to let that expert testify in mine are slim

14:33:06  13   and none.  That's why we have the wise people in Washington, to

14:33:13  14   look over my shoulder.

14:33:14  15           So, Mr. Dacus, tell me what you would propose.

14:33:16  16           MR. DACUS:  Yes, Your Honor.  And that's actually

14:33:18  17   what I was about to stand up and hopefully say to the Court.

14:33:22  18   As we lawyers tend to do, we sort of jumped into the briar

14:33:25  19   patch and started going down rabbit trails.  I want to be clear

14:33:30  20   with the Court.  We're here because we would like a trial date.

14:33:33  21   And with that we understand come limitations, and we are

14:33:36  22   absolutely more than willing to adhere to those.

14:33:39  23           I'll tell the Court we'll narrow down to three

14:33:41  24   motions in limine, we'll pick a summary judgment motion, we'll

14:33:45  25   pick a Daubert motion, if they'll agree to do the same and

14:33:48    1    we'll go forward on that basis.  Our -- our primary objective

14:33:53    2    here is to get a trial date.

14:33:55    3                And I do think we've had a discussion about a limited

14:33:58    4    opening of discovery.  Candidly, I think that makes sense.  I

14:34:02    5    think the Court's spot on, though, in drawing a delineation

14:34:08    6    between inserting facts into the record and reopening the

14:34:11    7    pleadings for things that have not been previously pled.  I

14:34:14    8    think the latter ought to be out of bounds.  The former

14:34:17    9    certainly makes sense.

14:34:18   10                So, from our perspective, if the Court could give us

14:34:21   11    a trial date -- you know, I know the Court is very busy.  I've

14:34:27   12    had scheduling conference with you in the last ten days, so I

14:34:30   13    know that very well.

14:34:31   14                THE COURT:  Yeah.  You're getting points.

14:34:32   15                MR. DACUS:  Sir?

14:34:33   16                THE COURT:  You're getting points as a frequent flyer

14:34:35   17    in my court.

14:34:36   18                MR. DACUS:  Well, I'm glad to have the opportunity,

14:34:40   19    to be quite honest.

14:34:41   20                THE COURT:  I don't know what you can cash them for.

14:34:43   21                MR. DACUS:  Probably the same thing I cash all my

14:34:46   22    other points for: not much.

14:34:48   23                But if the Court would see fit to give us a trial

14:34:51   24    date, Your Honor, at the Court's earliest convenience, I'm

14:34:55   25    confident we can conduct this limited discovery, I'm

| 14:34:58 | 1 | 100 percent confident we can cut down the motions under the |
| 14:35:01 | 2 | Court's direction, and -- and this case will be ready for trial |
| 14:35:05 | 3 | whenever the Court says it can try us. |
| 14:35:07 | 4 | So if there -- if I have failed to answer anything, |
| 14:35:11 | 5 | it wasn't by design.  I'm happy to do it. |
| 14:35:13 | 6 | THE COURT:  You've answered. |
| 14:35:15 | 7 | Let me hear from the defendant. |
| 14:35:17 | 8 | MR. SUMMERSGILL:  Thank you, Your Honor. |
| 14:35:18 | 9 | First piece is we think the case ought to remain |
| 14:35:22 | 10 | stayed because there are IPRs pending where decisions will come |
| 14:35:26 | 11 | out. |
| 14:35:26 | 12 | THE COURT:  Well, no.  Let me just stop there.  If |
| 14:35:30 | 13 | I'm going to open it up for some discovery and move along, that |
| 14:35:36 | 14 | doesn't mean I'm going to open it up for everything for you to |
| 14:35:39 | 15 | re-plead anything. |
| 14:35:41 | 16 | I can see merit in lifting the stay for you-all to do |
| 14:35:45 | 17 | what you need to do to resolve some of those motions and get |
| 14:35:52 | 18 | things moved around, where we can at least look at a trial |
| 14:35:58 | 19 | setting instead of waiting until we see what this last result |
| 14:36:02 | 20 | is going to be.  And, you know, I would lift the stay, but |
| 14:36:09 | 21 | then -- if I like what you're going to tell me about what you |
| 14:36:13 | 22 | would do in the interim, but then tell you all you can do in |
| 14:36:18 | 23 | the interim is A, B, C, and D until we get there. |
| 14:36:21 | 24 | One of my frustrations with what goes on at the -- |
| 14:36:28 | 25 | you know, the PTO and its various component parts is sometimes |

14:36:35  1   it gets stayed too long.  Sometimes different things happened.

14:36:40  2   So what I'm looking for is to move forward some way in this

14:36:43  3   case which is fair to everybody.  And what I'm contemplating is

14:36:49  4   we start doing some things while we're waiting for this last

14:36:53  5   piece of the puzzle to fit together from the PTO and find out

14:36:57  6   who is right and who is wrong in their predictions.

14:37:00  7           Has anybody gone to Vegas and bet this thing?  I'm

14:37:05  8   sure there's a book out there somewhere on patent and trademark

14:37:07  9   appeals that you could bet.  You can bet on everything else out

14:37:11  10  there.

14:37:11  11          But I think we're close on that, and I'd like to see

14:37:15  12  some movement in this case that is fair to everybody.

14:37:18  13          MR. SUMMERSGILL:  Your Honor, if that's your

14:37:20  14  inclination, understood.  What if we at least maintain the stay

14:37:26  15  through April so we see what happens with the Streck IPRs,

14:37:30  16  because that could impact things in the case and cause us to

14:37:35  17  have to redo things.  And then after that we agree upon, you

14:37:37  18  know, a fact discovery period and an expert discovery period

14:37:41  19  and a dispositive motions period.  We can try and work with the

14:37:45  20  other side to propose a schedule.  I imagine we'll be in

14:37:48  21  different places, but with your guidance we can come up with

14:37:52  22  something.

14:37:53  23          And then, you know, one way -- and this is what --

14:37:56  24  and Ms. Limbeek was out with us in Central District of

14:38:03  25  California.

| | | |
|---|---|---|
| 14:38:04 | 1 | THE COURT:  So pronounce your name for us. |
| 14:38:04 | 2 | MS. LIMBEEK:  Oh.  *Lim-beak*. |
| 14:38:05 | 3 | THE COURT:  Limbeek.  Okay.  I was the one |
| 14:38:07 | 4 | pronouncing it wrong.  I just want to make sure.  I try to get |
| 14:38:10 | 5 | that right.  I have a name like Yeakel that has been |
| 14:38:13 | 6 | mispronounced every possible way you can come up with, so I'm |
| 14:38:16 | 7 | very sensitive to people's names.  So I apologize for |
| 14:38:20 | 8 | mispronouncing your name. |
| 14:38:21 | 9 | MS. LIMBEEK:  No problem.  I'm used to it. |
| 14:38:23 | 10 | THE COURT:  Now proceed. |
| 14:38:24 | 11 | MR. SUMMERSGILL:  I think both parties, you know, |
| 14:38:25 | 12 | have indicated they'll limit the number of motions.  But one |
| 14:38:27 | 13 | way to force us to do that would be to impose some stringent |
| 14:38:31 | 14 | page limitations on motions in limine and dispositive motions |
| 14:38:35 | 15 | with which -- |
| 14:38:35 | 16 | THE COURT:  Another way is just to limit the motions |
| 14:38:37 | 17 | you're going to file. |
| 14:38:38 | 18 | MR. SUMMERSGILL:  Right.  Right.  So what we're |
| 14:38:40 | 19 | committed to limiting the number of -- |
| 14:38:41 | 20 | THE COURT:  I know how to cut back on your motions. |
| 14:38:44 | 21 | I like to give you a hand in it -- |
| 14:38:47 | 22 | MR. SUMMERSGILL:  Thank you, Your Honor. |
| 14:38:47 | 23 | THE COURT:  -- because I do want you to be prepared |
| 14:38:48 | 24 | to go to trial.  But I don't see a whole lot of things that |
| 14:38:52 | 25 | you've filed so far that help me get you to trial.  Let me put |

14:38:55   1   it that way.

14:38:55   2           MR. SUMMERSGILL:  But -- so, Your Honor, bottom line

14:38:58   3   for us is we'd ask the stay at least stay in place until April

14:39:01   4   so we can see what happens in Streck.  And then in the mean

14:39:04   5   time we can work out a proposed schedule of the fact discovery,

14:39:08   6   the expert discovery, and dispositive motions and submit

14:39:11   7   something.

14:39:11   8           THE COURT:  How long if I, after you leave my

14:39:14   9   courthouse today, will it take you to sit down together in good

14:39:22   10   faith and talk about what it really would take to get this case

14:39:26   11   to trial and what everybody needs to do?  And as part and

14:39:32   12   parcel of those discussions, presume one side's right and one

14:39:37   13   side's wrong on what is going to happen at the appeals board,

14:39:45   14   and then presume it the other way and work it out.

14:39:49   15           I think those things can happen, and you can do that

14:39:53   16   while we're moving down the line up there.  I'm not just going

14:39:57   17   to stay it -- leave the stay in effect and wait until April and

14:40:01   18   then you-all start talking.  I want you to start talking right

14:40:05   19   now, and I want you to come up with a plan for me and a

14:40:10   20   proposed schedule that makes some sense.

14:40:15   21           And then we can probably do this by phone.  I don't

14:40:20   22   need to run you down here every time.  But I like to run you

14:40:26   23   down here sometimes because I'm old-school and I think the

14:40:29   24   system works better when you're in a courtroom.  I don't like

14:40:32   25   so much the informality of doing everything by telephone.  But

14:40:35  1  I do recognize we've got a lot of out-of-town people in this

14:40:38  2  case, and I also like to see you-all at some point so I can

14:40:41  3  kind of size up who I think the problem is in the case.  I'll

14:40:44  4  just tell you that.

14:40:46  5         MR. SUMMERSGILL:  Your Honor, I'll say that when I

14:40:48  6  woke up in Boston Monday morning, it was 6 degrees, and when I

14:40:54  7  landed here it was 80 degrees and I went for a run along the

14:40:56  8  river.  So I appreciate you bringing us down.

14:41:00  9         THE COURT:  We're a friendly place down here.

14:41:02  10 College baseball season opened in Austin on February the 21st

14:41:03  11 in the evening, and I went to the ball game.  And we're going

14:41:06  12 to play baseball until June down here.  There will never be as

14:41:11  13 nice of night as the February night that it opened.  And I'm

14:41:14  14 thinking this is really crazy.  This is the best it's going to

14:41:17  15 get.

14:41:17  16        But we're -- we're generally this way.  But you don't

14:41:23  17 live in this part of the country to complain about winter.  You

14:41:25  18 live in this part of the country to complain about summer.  So

14:41:29  19 August is not when you would particularly like to be set for

14:41:31  20 trial.  Let me tell you that.

14:41:34  21        MR. SUMMERSGILL:  Right.  Right.  Well, Your Honor, I

14:41:35  22 think if we had a week -- and they can weigh in -- we can sit

14:41:41  23 down with them and try and work out the two proposed schedules

14:41:44  24 that you suggested.  And if we have disagreements, we can just

14:41:46  25 submit a document with the different positions to Your Honor,

14:41:50    1    if that would work.

14:41:51    2              THE COURT:  All right.  Now, I am aware that there's

14:41:57    3    a possibility, partly driven by the fact I've seen Mr. Dacus a

14:42:03    4    lot recently, that you-all might have more than one case that

14:42:07    5    you-all are working on at any given time.  So I want to move

14:42:10    6    this, but I don't want to put you on some impossible schedule

14:42:16    7    to get something back with me where, you know, we're kind of

14:42:21    8    wasting time with.  So you say a week.  Let me just tell you I

14:42:24    9    think a week is a little optimistic to get things worked out.

14:42:28   10    And so I want to get something done, but I don't want to put

14:42:32   11    you on too short a list.

14:42:34   12              So, from either one of you, what would be a

14:42:39   13    reasonable period of time for you to discuss this and get me a

14:42:42   14    proposed schedule?  And another thing I want you to do, as my

14:42:50   15    clerk has reminded me -- we recounted; we still have 17 -- part

14:42:53   16    of this I think I want you to agree and send us a list on what

14:42:57   17    you think the pending motions are in this case right now.

14:43:00   18    Because it's not a perfect system we have, and I don't care if

14:43:05   19    it is electronic, things go back and forth between here and the

14:43:08   20    Waco Division and things fall between the cracks.

14:43:11   21              So part of what I want in going forward in this case

14:43:17   22    is for us to all agree on what's pending right now.  And then

14:43:20   23    hopefully we're going to work it down and not deal with it all,

14:43:22   24    but I need to know how you-all get to 21 from the 17 we have.

14:43:28   25              But, Mr. Dacus, what is really a realistic period of

14:43:32 1   time for you-all to discuss this, because I want you-all to

14:43:34 2   discuss it and I want your clients to know that I don't care

14:43:37 3   what they think.

14:43:38 4          MR. DACUS:  Understood.

14:43:38 5          THE COURT:  I'm dealing with the lawyers, and I want

14:43:41 6   you-all to discuss this as lawyers so we can get this case

14:43:44 7   ready to try.

14:43:46 8          MR. DACUS:  I do think, Your Honor, within a couple

14:43:48 9   of weeks we should be able to do that.  One thing I was going

14:43:52 10  to respectfully ask the Court, if the Court could give us some

14:43:55 11  indication of what you might be thinking as potential trial

14:43:59 12  date, I think lawyers work best if they -- if we have a target

14:44:04 13  out there of what the potential trial date might be.  We could

14:44:07 14  better give the Court a schedule on what we think would be

14:44:10 15  appropriate as far as limiting motions, getting those to you,

14:44:14 16  and the fact discovery timeline.

14:44:17 17         THE COURT:  Yeah.  But I generally have let that be

14:44:27 18  driven by how long the lawyers realistically need.  I don't

14:44:31 19  have -- if you've googled me to death, as I know you have, and

14:44:34 20  have looked at everything on my docket, because that's what

14:44:36 21  lawyers do, if you see anything that looks like a pattern, it's

14:44:42 22  purely coincidental.  That's why I don't have patent rules.

14:44:46 23  There's a reason why the district doesn't have patent rules,

14:44:48 24  because it's so big and diverse, we have a hard enough time

14:44:50 25  getting local rules on anything with our divisions.  But I

14:44:54  1   don't have specific rules in my court because I like to know

14:45:00  2   from the lawyers what you really need to do to get done and

14:45:05  3   then play it out and see how it goes.

14:45:07  4           MR. DACUS:  Fair enough, Your Honor.

14:45:08  5           THE COURT:  Now, I can tell you, as I said, think of

14:45:10  6   that block of cheese.  If you just want me to pull a number out

14:45:15  7   of the air, it would be a long way off.  But if I see something

14:45:17  8   from you that's cohesive, I can find a hole somewhere.  There

14:45:23  9   are holes in that block of cheese.  And so I don't have a deal

14:45:28  10  that it's always going to be this many months or it's always

14:45:31  11  going to be that.  It's up to you.  You-all have to want to get

14:45:36  12  this case resolved.  And then I need your help and you telling

14:45:39  13  me what it's going to take.

14:45:40  14          So I want you to move first.  But I'll get you back

14:45:42  15  on the phone when I get your report right away and can tell you

14:45:45  16  when I'm thinking about setting this based on what you're

14:45:48  17  telling me you need to do and what time you need.

14:45:52  18          But know it can be closer than probably what you're

14:45:58  19  thinking, of late '24 or something like that.  You know, we've

14:46:03  20  got a lot of stuff going on between now and the fall, but I've

14:46:05  21  learned, because of the way this docket is and the fact that we

14:46:08  22  don't get any help, I just overbook.  And God looks out after

14:46:12  23  small children and idiots and dogs and judges.  And so I'm

14:46:16  24  going to get burned on it some time, but it's always worked out

14:46:21  25  to where who needed to get to trial got to trial because

14:46:24  1  everything else around them settled.

14:46:26  2          So if it doesn't, then, you know, I'll -- one of the

14:46:30  3  things I'll do is, if you or somebody else are ready at the

14:46:35  4  same time, is find a visiting judge somewhere.  You might not

14:46:38  5  like that as well as you like this, but you don't know.

14:46:41  6          Or, you know, we have magistrate judges here, too.

14:46:47  7  You have to consent, but they have dockets that are much more

14:46:51  8  flexible and less complex than mine.  So if you really wanted

14:46:55  9  to get it to trial, you could consent to one of our magistrate

14:46:59 10  judges.  They're good judges.

14:47:01 11          MR. DACUS:  That's helpful, Your Honor.  And I think,

14:47:03 12  based on the guidance that you've given us, I'm still confident

14:47:07 13  that within a couple of weeks we could get a report to the

14:47:10 14  Court as to what we think we need to get the case ready.

14:47:13 15          THE COURT:  How many are a couple of weeks?

14:47:13 16          MR. DACUS:  Two weeks.

14:47:14 17          THE COURT:  From today?

14:47:15 18          MR. DACUS:  Yes, sir.  Two weeks from today.

14:47:17 19          MR. SUMMERSGILL:  And, Your Honor, I'll propose 21

14:47:19 20  weeks and see if Mr. Dacus will agree with me.  And we'll have

14:47:23 21  a real chance to negotiate and see if we can reach as much

14:47:27 22  agreement as possible.

14:47:29 23          THE COURT:  So just give me a date that you -- you

14:47:33 24  can get me report in that's a realistic date.

14:47:41 25          MR. DACUS:  I'd say March 14, Your Honor.

| | | |
|---|---|---|
| 14:47:55 | 1 | MR. SUMMERSGILL:  Your Honor, how about March 22nd? |
| 14:47:58 | 2 | MR. DACUS:  That's fine with us. |
| 14:47:59 | 3 | THE COURT:  All right.  Now, I know we do CM/ECF |
| 14:48:02 | 4 | filing and that makes it a 24-hour day.  I don't want it in a |
| 14:48:05 | 5 | 24-hour day. |
| 14:48:06 | 6 | If I'm telling you March 22nd, I want something in |
| 14:48:09 | 7 | here by five o'clock on March 22nd, whether you file it |
| 14:48:13 | 8 | electronically or whether you email it.  Down here to my right |
| 14:48:16 | 9 | is Katie Carmona, who is my chambers attorney who has overall |
| 14:48:22 | 10 | supervision to your file. |
| 14:48:28 | 11 | I didn't need that, but thank you.  I can do the |
| 14:48:29 | 12 | single-digit and double-digit math in my head without looking |
| 14:48:33 | 13 | at the calendar. |
| 14:48:33 | 14 | But I want a joint status report by the close of |
| 14:48:36 | 15 | business on March the 22nd, 2023.  I want included in that is |
| 14:48:42 | 16 | your list of motions, and I want you to provide me with a copy |
| 14:48:47 | 17 | of Judge Klausner's ruling that is no longer in effect, because |
| 14:48:51 | 18 | if that comes up again, I want to be able to read it and hear |
| 14:48:55 | 19 | what you're arguing about it.  So I want a copy of that, too. |
| 14:48:58 | 20 | But get me -- sit down, work with this, demean |
| 14:49:03 | 21 | yourselves like the professionals you are as lawyers, and lay |
| 14:49:08 | 22 | this out for me on what we can do to get it moved along, and |
| 14:49:11 | 23 | I'll give you a setting. |
| 14:49:12 | 24 | MR. DACUS:  Okay.  Great.  Thank you. |
| 14:49:14 | 25 | MR. SUMMERSGILL:  And, Your Honor, just to clarify -- |

14:49:15   1   and I think this is the case; just to make sure though -- in

14:49:20   2   this report you want both parties to specify at a high level

14:49:22   3   what we think needs to be done before, you know, the discovery

14:49:25   4   they think they need and the discovery we think we need, just

14:49:29   5   at a high level?

14:49:30   6             THE COURT:  No.  I really want you to agree on it.

14:49:33   7             MR. SUMMERSGILL:  Well, we're going to try to agree

14:49:34   8   on it.  I think we're going to end up realistically with some

14:49:38   9   disagreements.  But just to -- the list --

14:49:41  10             THE COURT:  If you have a disagreement, make sure you

14:49:45  11   both are operating in a reasonable manner.  I don't want to see

14:49:52  12   an unreasonable disagreement.  And the burden you have is I get

14:49:55  13   to define that.  You know, the perks of a United States

14:50:02  14   district judge are highly overstated, but one of the things is

14:50:05  15   I get to define the terms we're going to use in my court.

14:50:09  16             MR. SUMMERSGILL:  Understood, Your Honor.

14:50:10  17             THE COURT:  Think of it as procedural claims

14:50:13  18   construction.  Whatever you claim I'm going to construe, and

14:50:15  19   whatever you claim I'm going to construe.

14:50:17  20             But try to get all of that worked out, because I

14:50:18  21   think you can do it and we can refine this down and I can get

14:50:23  22   you done.  And, in the interim, things that are going to happen

14:50:25  23   in Washington are things that are happening in Washington.  And

14:50:28  24   we can let it overlap and we can get there.

14:50:32  25             Anything else while I have you-all here?

14:50:36  1              MR. SUMMERSGILL:  Nothing from Natera, Your Honor.

14:50:37  2              MR. DACUS:  Nothing from the plaintiff, Your Honor.

14:50:39  3              THE COURT:  Okay.  Well, thank you-all for being

14:50:41  4      available.  I look forward to working with you on this, and I

14:50:45  5      look forward to getting a report on March the 22nd.  And as

14:50:49  6      soon as I've had a chance to review it, we'll probably --

14:50:52  7      Ms. Carmona will contact you and see about setting up a

14:50:56  8      conference call of some kind, and we'll talk about it without

14:50:59  9      everybody running right back down here.

14:51:03  10             All right.  Thank you-all.  Court's in recess.

14:51:05  11         (End of transcript)

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

                    ARLINDA L. RODRIGUEZ, OFFICIAL COURT REPORTER
              U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

```
 1   UNITED STATES DISTRICT COURT        )

 2   WESTERN DISTRICT OF TEXAS           )

 3        I, Arlinda Rodriguez, Official Court Reporter, United

 4   States District Court, Western District of Texas, do certify

 5   that the foregoing is a correct transcript from the record of

 6   proceedings in the above-entitled matter.

 7        I certify that the transcript fees and format comply with

 8   those prescribed by the Court and Judicial Conference of the

 9   United States.

10        WITNESS MY OFFICIAL HAND this the 2nd day of March 2023.

11

12                              /S/ Arlinda Rodriguez
                                Arlinda Rodriguez, Texas CSR 7753
13                              Expiration Date:  10/31/2023
                                Official Court Reporter
14                              United States District Court
                                Austin Division
15                              501 West 5th Street, Suite 4152
                                Austin, Texas 78701
16                              (512) 391-8791

17

18

19

20

21

22

23

24

25
```